IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 19-cv-01871-PAB-MEH

MARTA SANCHEZ,
THE ESTATE OF STEPHANIE LOPEZ, and
DOMINIC MARTINEZ,

       Plaintiffs,

v.

CITY OF LITTLETON,
DOUG STEPHENS, Police Chief of Littleton, in his official capacity,
ANTHONY GUZMAN, individually,
LUKE MCGRATH, individually,
JOSEPH CARNS, individually,
CITY OF ENGLEWOOD,
JOHN COLLINS, Police Chief of Englewood, in his official capacity, and
BRIAN MARTINEZ, individually,

       Defendants.

---

**ORDER**

---

      This matter is before the Court on Defendants' Partial Motion to Dismiss [Docket No. 61] filed by defendants the City of Littleton, Douglas Stephens, Anthony Guzman, Luke McGrath, and Joseph Carns (collectively, the "Littleton defendants") and Defendants City of Englewood, John Collins, and Brian Martinez's Motion for Partial Dismissal [Docket No. 62] filed by defendants the City of Englewood, John Collins, and Brian Martinez (collectively, the "Englewood defendants").  Plaintiffs responded to both motions, *see* Docket Nos. 74 and 72, to which the Littleton defendants and the Englewood defendants replied.  *See* Docket Nos. 76 and 77, respectively.

## I.   BACKGROUND[1]

On June 29, 2017,[2] the Littleton Police Department received a report that a vehicle had been stolen from a Dunkin Donuts in Littleton, Colorado.  Docket No. 54 at 7, ¶ 34.  Littleton police officers observed what they believed to be the stolen car at various times that evening: defendant Luke McGrath observed what he suspected to be the stolen car at a gas station located on Santa Fe Drive, while defendant Joseph Carns observed the same vehicle traveling northbound on Santa Fe Drive.  *Id.* at 2, ¶¶ 3-4.  The vehicle in question was occupied by plaintiffs: Marta Sanchez was driving, Stephanie Lopez was in the front passenger seat, and Dominic Martinez was in the back seat.  *Id.*, ¶ 6.

Defendant Carns pulled his patrol car in behind plaintiffs' vehicle and followed it.  *Id.*, ¶ 4.  After defendant Anthony Guzman received a radio command from the Littleton Police Commander to pursue the vehicle, he fell in behind defendant Carns' patrol car and followed the vehicle.  *Id.*, ¶ 5.  Defendant McGrath followed behind defendant Guzman in his marked car.  *Id.* at 8, ¶ 38.  After requesting permission to do so, defendant Carns executed a precision immobilization technique ("PIT") maneuver to stop plaintiffs' vehicle, striking the rear end of plaintiffs' vehicle and causing it to spin and come to a stop on Santa Fe Drive.  *Id.* at 2-3, ¶ 7; *id.* at 8, ¶ 42.

---

[1] These facts are taken from plaintiffs' Amended Civil Rights Complaint With Request for Trial by Jury [Docket No. 54] and are assumed true for purposes of this order unless otherwise noted.  *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

[2] Plaintiffs allege that these events occurred "on or about June 29, 2017, at around midnight."  Docket No. 54 at 2, ¶ 2; *see also id.* at 8, ¶ 41.

Defendant Guzman got out of his car and drew his pistol. *Id.* at 8, ¶ 44. He walked toward plaintiffs' stopped vehicle and shot into the vehicle at least nine times without giving a warning and without being in imminent danger. *Id.* Defendants Carns and McGrath also left their vehicles and each fired shots into plaintiffs' stopped vehicle without giving a warning or being in imminent danger; McGrath fired at least seven shots into the vehicle. *Id.* at 9, ¶¶ 46-47. As defendants shot into plaintiffs' vehicle, plaintiffs did not move their vehicle, did not use their vehicle as a weapon, and did not use or display any firearms. *Id.*, ¶ 48.

Plaintiffs "started their vehicle slowly" and proceeded to drive away while defendant Guzman fired at the vehicle. *Id.*, ¶¶ 49-51. Defendants Guzman, Carns, and McGrath followed plaintiffs' vehicle down the street; Guzman conducted another PIT maneuver on plaintiffs' vehicle, which caused the vehicle to come to a rest on Bannock Street. *Id.* at 9-10, ¶¶ 51-55. At this point, plaintiff Martinez, who had a gunshot wound to his leg, jumped out of the car. *Id.* at 10, ¶¶ 53-54; *id.* at 12, ¶ 70.[3]

While plaintiffs' vehicle was stopped, defendant Carns fired his gun at least five times into the vehicle without warning and without fearing for his own safety. *Id.* at 3, ¶ 11; *id.* at 10-11, ¶¶ 58, 60. Defendant Guzman did the same, shooting his gun into plaintiffs' car without warning and without being in imminent danger. *Id.* at 10, ¶ 56. Plaintiff Sanchez then placed the car in reverse and drove south on Bannock. *Id.*, ¶ 57. Defendant Guzman followed plaintiffs' vehicle in his patrol car and collided with it,

---

[3] Plaintiff Martinez was apprehended by police the next day. Docket No. 54 at 10, ¶ 54.

causing plaintiffs' vehicle to strike a pole, rendering it inoperable.  *Id.* at 3, ¶ 12; *id.* at

11, ¶¶ 61-62.  Defendant Guzman then fired at least 21 shots into plaintiffs' vehicle.

*Id.*, ¶¶ 62-63.

Defendant Brian Martinez of the Englewood Police Department arrived on the

scene after plaintiffs' vehicle had struck the pole and been rendered inoperable.  *Id.*,

¶ 64.  Martinez fired several shots into plaintiffs' vehicle.  *Id.*, ¶ 65.  Defendant Martinez

then noticed that Sanchez was holding her hands up and shouted to Guzman to hold

his fire.  *Id.* at 12, ¶ 67.  Sanchez had held her hands up during each of the three

separate stops.  *Id.*, ¶ 68.  Martinez had his hands up during the first stop.  *Id.* at 8,

¶ 45.

Plaintiff Sanchez suffered fourteen bullet wounds from defendants' gunshots,

which left her paralyzed.  *Id.*, ¶ 69.  Plaintiff Lopez suffered several gunshot wounds,

one of which was a fatal gunshot wound to her head.  *Id.* at 4, ¶ 15.  Collectively, at

least 44 shell casings were found at the scenes of the stops.  *Id.* at 12, ¶ 71.

Plaintiffs – Sanchez, Dominic Martinez, and the Estate of Stephanie Lopez ("the

Estate") – assert four claims for relief: (1) a § 1983 excessive force claim in violation of

plaintiffs' Fourth and Fourteenth Amendment rights against defendants Guzman,

McGrath, Carns, and Martinez;[4] (2) a § 1983 *Monell* claim against defendants

Stephens, Collins, Littleton, and Englewood; (3) a negligence claim against all

defendants; and (4) a wrongful death claim by the Estate against defendants Guzman,

---

[4] The excessive force claim against defendant Martinez is brought by plaintiffs
Sanchez and the Estate only.  Docket No. 54 at 13 n.2.

McGrath, Carns, and Martinez.  *Id.* at 13-20.  Defendants move for partial dismissal of plaintiffs' claims.  Docket No. 61; Docket No. 62.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)).

## III.  ANALYSIS

The Littleton defendants seek dismissal of plaintiffs' excessive force claim, to the extent that it is based on the first and second shootings, and plaintiffs' due process claim, in its entirety, on the basis that they are entitled to qualified immunity.[5]  Docket No. 61 at 3-8.  In addition, they seek dismissal of plaintiffs' municipal and supervisory liability claim under *Monell* on the basis that plaintiffs fail to state a claim upon which relief can be granted.  Docket No. 61 at 8-12.  The Englewood defendants seek dismissal of plaintiff's excessive force claim against defendant Martinez based on qualified immunity grounds.  Docket No. 62 at 3.  They also move for dismissal of plaintiffs' supervisory liability claim against defendant Collins, on the basis that he is entitled to qualified immunity, and argue that plaintiffs' *Monell* claim should be dismissed for failure to state a claim.  *Id.* at 7-14.

### A.  Plaintiffs' State-Law Claims

---

[5] Plaintiffs' excessive force claim is brought under both the Fourth and the Fourteenth Amendments.  Docket No. 54 at 13.

6

The Littleton defendants argue that plaintiffs' negligence claim against the individual officers is barred under the statute of limitations, Colo. Rev. Stat. § 13-80-103(1)(c) ("[a]ll actions against . . . police officers" must be "commenced within one year after the cause of action accrues"), and that plaintiffs' negligence claim against the city defendants is barred under the Colorado Governmental Immunity Act ("CGIA") on the basis that the claim does "not fall within one of the waiver categories for municipalities" under the Act.  Docket No. 61 at 13-14, ¶¶ 28-32.  In addition, the Littleton defendants assert that the Estate's wrongful death claim is barred because the Estate did not file notice of the claim within 182 days of its accrual pursuant to the CGIA, Colo. Rev. Stat. § 24-10-109.  *Id.* at 14-15, ¶¶ 33-34.  The Englewood defendants "incorporate the Littleton Defendants' discussion of the various deficiencies [in these claims]."  Docket No. 62 at 14-15.  In their responses to the motions to dismiss, plaintiffs "concede dismissal of the[ir] state law claims."  Docket No. 74 at 15; Docket No. 72 at 13.  Accordingly, the Court will grant defendants' motions to dismiss to the extent that they seek to dismiss plaintiffs' third and fourth claims.

Plaintiffs assert that the claims should be dismissed without prejudice because, if the claims are dismissed as untimely under the statute of limitations, the claims would be dismissed on jurisdictional grounds.  *Id.*  However, "[u]nder Colorado law, a statute of limitations limits the time in which an action may be brought, but does not operate as a jurisdictional bar."  *Schimmer v. State Farm Mut. Auto. Ins. Co.*, No. 05-cv-02513-MSK, 2006 WL 1658550, at *1 (D. Colo. June 8, 2006) (citing *Colo. Dept. of Public Health and Envt. v. Caulk*, 969 P.2d 804, 808 (Colo. App.1998)).  "If a claim is untimely

under the statute of limitations it [will] be dismissed with prejudice."  *Glaser v. City and Cty. of Denver*, No. 12-cv-00828-RBJ-KLM, 2013 WL 1397285, at *6 (D. Colo. Apr. 3, 2013); *see also McGowan v. Wal-Mart Stores*, 757 F. App'x 786, 788 n.3 (10th Cir. 2019) ("A dismissal based on timeliness would ordinarily be with prejudice.").  Because the Court finds that plaintiff's negligence claim is untimely, *see* Colo. Rev. Stat. § 13-80-103(1)(c); *see also* Docket No. 1, the claim will be dismissed with prejudice as to the individual officers.

However, defendants' arguments under the CGIA "constitute a challenge to the court's subject matter jurisdiction."  *Schreiner v. City of Louisville*, 15-cv-00287-REB-CBS, 2015 WL 9437882, at *1 (D. Colo. Dec. 4, 2015), *report and recommendation adopted*, 2015 WL 9315736 (D. Colo. Dec. 23, 2015) (citing Colo. Rev. Stat. § 24-10-109(1)).  Accordingly, plaintiffs' third claim, with respect to the entity defendants, and fourth claim in its entirety will be dismissed without prejudice for lack of subject matter jurisdiction.  *See Dorsey v. Pueblo Sch. Dist. 60*, 140 F. Supp. 3d 1102, 1112 (D. Colo. 2015) (dismissing state law claim without prejudice for lack of jurisdiction where the complaint "lacked sufficient jurisdictional facts to support an immunity waiver").

### B.   Claim One – Excessive Force

The individual defendants[6] argue that they are entitled to qualified immunity with respect to plaintiffs' excessive force claim.  Docket No. 61 at 3; Docket No. 62 at 3. Defendant Martinez argues that he is entitled to qualified immunity for the entirety of

---

[6] In this section, "individual defendants" refers to the defendants named in this claim – Guzman, McGrath, Carns, and Martinez.  Docket No. 54 at 13.

plaintiffs' excessive force claim, *id.*, while defendants Guzman, McGrath, and Carns argue that they are entitled to qualified immunity with respect to the first and second shootings only.  Docket No. 61 at 3.[7]

### 1.  Defendants Guzman, McGrath, and Carns

Defendants Guzman, McGrath, and Carns argue that they are entitled to qualified immunity to the extent that plaintiffs' excessive force claim is based on the first and second shootings.[8]  Docket No. 61 at 3.  They assert that, because plaintiffs "fled the area in the vehicle after the first shooting, no seizure occurred and they have not alleged a Fourth Amendment violation" as to the first shooting.  *Id.* at 5, ¶ 7.  As to the second shooting, defendants raise separate arguments with respect to each individual

_____

[7] The Littleton defendants assert that, if their motion is granted, only plaintiff Sanchez's excessive force claim against defendant Guzman will remain, Docket No. 61 at 3 n.1, implying that the Estate's claim against Guzman with respect to the third shooting may be dismissed despite the Littleton defendants' failure to raise any arguments to dismiss that claim.  *See generally id.*  The Littleton defendants' assertion appears to be based on an assumption that plaintiffs have alleged that Lopez died before the third shooting and could not have been seized during the third stop.  *See id.* at 5, ¶ 10 ("The Complaint alleges that Stephanie Lopez . . . was shot and killed during the second shooting.").  However, plaintiffs' complaint alleges only that, during the second shooting, Lopez was shot in the back of her head, "which allegedly came from Defendant Carns' firearm during the [second] stop, which [led] to her demise."  Docket No. 54 at 4; *see also id.* at 11, ¶ 59 (alleging that Lopez's autopsy revealed a fatal wound to the back of her head "may have come from the [gun] used by Defendant Carns.").  But these allegations do not demonstrate that Lopez was deceased before the third stop.  In fact, plaintiffs allege that, at the time of the third stop, "Lopez may have been deceased," not that she was deceased.  *Id.* at 11, ¶ 66.  In essence, the Littleton defendants ask the Court to draw an inference in their favor, which the Court cannot do.  *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).  The Littleton defendants have offered no arguments supporting the dismissal of the Estate's excessive force claim against Guzman with respect to the third shooting.

[8] Because the Littleton defendants' arguments are limited to the first and second shootings, *see* Docket No. 61 at 3, so too is the Court's analysis.

defendant.  They assert that no seizure of Sanchez occurred because she continued to flee after the second shooting, *id.*, that no seizure occurred as to Martinez because he removed himself from the vehicle after the first shooting, *id.*, ¶ 8, and that, with respect to Lopez, no seizure occurred because it was not clearly established at the time of the shooting that the use of deadly force against an individual who is not the target of the force constitutes a seizure.  *Id.* at 5-6, ¶¶ 10-11.

"To state a claim of excessive force under the Fourth Amendment, a plaintiff must show both that a seizure occurred and that the seizure was unreasonable."  *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994) (quotation omitted).  "[W]ithout a seizure, there can be no claim for excessive use of force."  *Jones v. Norton*, 809 F.3d 564, 575 (10th Cir. 2015).  "When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submits to the assertion of authority.'"  *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) (quoting *California v. Hodari D.*, 499 U.S. 621, 625-26 (1991)) (alteration marks omitted).  The Tenth Circuit has determined that, where a suspect fails to submit to a police officer's show of authority and instead flees from the officer, no seizure has occurred even if the officer uses deadly force against that suspect.  *See Farrell v. Montoya*, 878 F.3d 933, 937-39 (10th Cir. 2017).

In *Farrell*, a police officer pulled a woman over for speeding.  *Id.* at 934.  As the police officer walked back to his patrol car to communicate with dispatch, the woman "slowly pulled [her vehicle] onto the road, continuing down the highway at a normal speed."  *Id.* at 935.  The officer pursued the woman in his car with his siren on, which

10

led the woman to pull over again.  *Id.*  An altercation ensued, which included the officer

reaching into the vehicle to pull the woman out of the driver's side door and the officer

pointing his Taser into the vehicle, which resulted in the woman's children, who were in

the vehicle, "screaming and jumping in and out of the minivan."  *Id.*  Two other patrol

cars arrived; one officer got out of his car and drew his gun while the original officer

broke the vehicle's rear passenger window with his baton.  *Id.* at 936.  At this point, "the

minivan began to drive away at a moderate speed," at which point the arriving officer

"aimed his gun in the direction of the minivan and fired three shots," which did not hit

the minivan and did not slow or stop the minivan.  *Id.*  The officers returned to their

vehicles and pursued the minivan, which eventually stopped at a hotel parking lot, at

which point the woman surrendered to police.  *Id.*  The woman and her family sued the

police officers, arguing that the arriving officer used excessive force when he fired the

three shots at the minivan.  *Id.*

The Tenth Circuit reversed the district court's denial of summary judgment in

favor of the arriving officer, finding that no seizure had occurred.  *Id.* at 939.  The court

reasoned that, because the woman was fleeing when the officer fired his gun at her

vehicle, "[she was] not submitting to the officers" and was not seized.  *Id.* at 937.  The

Tenth Circuit rejected the plaintiffs' argument that the woman had submitted to the

police officers' authority when she momentarily halted before the officer fired his gun,

because "a momentary pause is not submission."  *Id.* at 938.  "[T]o comply with an

order to stop – and thus to become seized – a suspect must do more than halt

temporarily; he must submit to police authority, for there is no seizure without actual

submission." *Id.* (quoting *United States v. Salazar*, 609 F.3d 1059, 1066 (10th Cir. 2010))[9]; *see also United States v. Martin*, 613 F.3d 1295, 1300 (10th Cir. 2010) ("A submission to a show or assertion of authority requires that a suspect manifest compliance with police orders.") (quotation omitted).

Defendants argue that, under *Farrell*, no seizure occurred here because plaintiffs continued to flee after the first stop. Docket No. 61 at 5, ¶ 7. Plaintiffs disagree, asserting that, at each stop, they submitted to defendants' show of authority. Docket No. 74 at 7. Plaintiffs contend that they submitted to the officers' authority when the "car was completely stopped and the driver of the vehicle put her hands up," and "only after the shots began did the plaintiffs attempt to escape the hail of bullets." *Id.* at 7-8.

The Court agrees with defendants that the complaint does not sufficiently allege that a seizure of plaintiffs occurred. While the Tenth Circuit has suggested that "a person's momentary yielding to an officer's apparent show of authority before fleeing [is] relevant to [the] seizure determination," *Brooks v. Gaenzle*, 614 F.3d 1213, 1224 n.9 (10th Cir. 2010), it has also stated that "a momentary pause is not submission." *Farrell*, 878 F.3d at 938. In the context of a purported seizure of an individual in a moving vehicle, courts consistently hold that a "driver's initial fleeting stop does not amount to . . . submission." *Baldwin*, 496 F.3d at 216. *See, e.g.*, *Torres v. Madrid*, 769 F. App'x 654, 657 (10th Cir. 2019) (unpublished), *cert. granted*, 140 S. Ct. 680 (2019)

---

[9] Notably, the Tenth Circuit also relied on the fact that the dash-cam video evidence contradicted the factual basis of the plaintiffs' argument, as "there was no pause in the minivan's departure." *Farrell*, 878 F.3d at 938.

(driver was not seized when she continued to drive after being shot at by police);

*Farrell*, 878 F.3d at 938; *see also United States v. Garrette*, 2017 WL 3337258, at *2

(N.D. Fla. Aug. 4, 2017) ("where a driver resumes driving or otherwise retreats either

immediately or shortly after bringing his car to a halt," . . . "courts have consistently held

that the driver's temporary halt in movement does not constitute acquiescence to police

authority.") (citing cases).

 The momentary halt of a car during a police chase is insufficient to demonstrate

submission to authority. *Farrell*, 878 F.3d at 938. While plaintiffs allege that, after the

first and second PIT maneuvers, their vehicle stopped, plaintiffs do not allege that

Sanchez stopped the vehicle as an act of submission. *See* Docket No. 54 at 8, ¶ 42; *id.*

at 10, ¶ 52. Plaintiffs' complaint contains no other allegations demonstrating that

plaintiffs submitted to defendants' show of authority other than allegations that Sanchez

and Martinez raised their hands. Plaintiffs argue that their actions "constitute more

than a momentary pause," Docket No. 74 at 7, but there are no allegations in the

complaint indicating how long plaintiffs waited before fleeing again. Moreover, the

context of plaintiffs' allegations make any inference of a longer pause implausible. The

complaint describes several police cars pursuing plaintiffs, the use of PIT maneuvers to

stop plaintiffs' car, plaintiffs' car leaving the scene of the first and second shootings,

followed by a final intervention to stop plaintiffs' vehicle. Plaintiffs' allegations that their

car stopped or came to a rest are insufficient to show that they "submit[ted] to police

authority." *Farrell*, 878 F.3d at 938; see also *Martin*, 613 F.3d at 1300 (individual being

seized "must take actions that show he has placed himself under the control of a

13

person in authority or power") (quotation and emphasis omitted).

While plaintiffs allege that Sanchez and Martinez held their hands up in surrender at the first stop, and that Sanchez held her hands up at the second stop, *see* Docket No. 54 at 8, ¶ 45; *id.* at 12, ¶ 68, there are no allegations that any of the defendants saw or were aware of this purported submission to authority. In fact, the complaint alleges that the officers did not see Sanchez put her hands up until the third stop. *See id.* ("Sanchez held her hands up during the three separate stops, but this was not observed until Officer Martinez saw her on the last stop at Louisiana Avenue."). And, in any event, plaintiffs drove away from the scenes of the first two shootings after these purported submissions to authority. *Id.* at 9, ¶ 51.

In a qualified immunity case, plaintiffs bear the burden of demonstrating that defendants violated clearly established law at the time of the alleged offense. *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020). Typically, to find that the law was clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Id.* (quotation omitted). Plaintiffs cite to no authority demonstrating that they were seized under clearly established law. *See* Docket No. 74 at 6-9. In fact, plaintiffs assert that "[t]he Tenth Circuit's decisions on 'seizure' in excessive force claims lack clarity." *Id.* at 8. The Court finds that plaintiffs have not sufficiently alleged that they were seized during the first or second stops or that

defendants violated clearly established law.[10]  Accordingly, the Court will dismiss plaintiffs' excessive force claims, with respect to defendants Guzman, McGrath, and Carns, as to the first and second stops.[11]

### 2. Defendant Martinez

The Englewood defendants argue that defendant Martinez is entitled to qualified immunity on plaintiffs' excessive force claim, to the extent it is brought by the Estate, on the grounds that Martinez "did not participate in any unlawful conduct related to Lopez."[12]  Docket No. 62 at 3.  This argument, however, is based on the assumption that Lopez died prior to the third shooting, which assumption the Court has already rejected.  *See id.* at 4-5 (stating that, "at the time . . . of the third stop, Lopez was already dead" and arguing that Martinez cannot be held liable for conduct that occurred before he was present).  As the Court has explained above, construing plaintiffs' complaint to allege that Lopez died before the third shooting would be impermissibly drawing an inference in the defendants' favor.  The Court declines to do so.

In the alternative, defendant Martinez argues that he is entitled to qualified immunity because it is not clearly established that Martinez's "lack of personal

---

[10] Plaintiffs' allegations that they only began driving again to escape defendants' gunfire does not change the Court's analysis. "[A]lleged subjective intentions, like most subjective intentions, [are] not material to the Fourth Amendment issue."  *Farrell*, 878 F.3d at 939.

[11] Because defendants do not raise any arguments with respect to the third stop, plaintiffs' first claim survives as to the third stop.

[12] The Englewood defendants do not argue that the excessive force claim against defendant Martinez should be dismissed as to plaintiff Sanchez.  *See* Docket No. 62.

involvement in the use of force subjects him to constitutional liability."  Docket No. 62 at 5.  Again, this argument relies on the incorrect assumption that plaintiffs have alleged that Lopez died during the second stop or before the third stop.  *See id.* at 7 (arguing that defendant Martinez "was not on notice . . . that his lack of involvement in the use of force which killed Lopez might confer liability for any constitutional violation on him").  Plaintiffs admit that "[d]efendant Martinez's conduct is limited to only the third stop/shooting," Docket No. 72 at 6, which the Court interprets as a concession that, with respect to defendant Martinez, the excessive force claim relates to the third stop only.  Defendant Martinez does not argue that no seizure occurred during the third stop.  *See* Docket No. 62 at 4 ("The Court does not need to address the seizure requirement . . . since Plaintiffs allege that Lopez was killed during the second stop, not the third.").

Because the Englewood defendants' argument is based solely on the assumption that Lopez had died before defendant Martinez arrived at the scene and, as a result, Martinez could not have participated in the seizure of Lopez – an assumption which the Court has rejected – they have not demonstrated that dismissal of this claim is warranted.  Thus, the Court will deny the Englewood defendants' motion to dismiss to the extent it seeks dismissal of the excessive force claim against Martinez.

### 3.  Fourteenth Amendment Excessive Force

Plaintiffs' excessive claim is brought, in the alternative, under the Fourteenth Amendment.  *See* Docket No. 54 at 13.  "Excessive force claims can be maintained

under the Fourth, Fifth, Eighth, or Fourteenth Amendment . . . and each carries with it a very different legal test." *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010). "Determining which amendment applies to an allegation of excessive force requires consideration of 'where the [plaintiff] finds himself in the criminal justice system.'" *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (quoting *Porro*, 624 F.3d at 1325). A claim of excessive force "leading up to and including an arrest" is actionable under the Fourth Amendment's prohibition against unreasonable seizures. *Porro*, 624 F.3d at 1325. But, where neither the Fourth nor the Eighth Amendments apply, courts "turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities." *Id.* at 1326; *see also Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003) ("Substantive due process analysis is appropriate in cases that involve excessive force where a specific constitutional provision – such as the Fourth or Eighth Amendment – does not apply.").

"An excessive force claim under the Fourteenth Amendment targets arbitrary governmental action, taken without due process." *Estate of Booker*, 745 F.3d at 423 (quotation omitted). "To determine whether a use of force is excessive under the Fourteenth Amendment[, courts] consider three factors: '(1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor.'" *Id.* (quoting *Roska*, 328 F.3d at 1243).

No defendant argues that plaintiffs cannot state a Fourteenth Amendment claim under the *Roska* factors. *See* Docket No. 61; Docket No. 62. Instead, defendants

17

argue that plaintiffs have failed to demonstrate that the actions of the defendants who shot into plaintiffs' vehicle were "conscience-shocking." *See* Docket No. 61 at 6; Docket No. 62 at 4. "Force inspired by malice or by unwise, excessive zeal amounting to an abuse of official power that shocks the conscience may be redressed under the Fourteenth Amendment." *Roska*, 328 F.3d at 1243.[13] "[O]n a motion to dismiss, the relevant question is whether the complaint alleges facts that 'could be conscience shocking, depending, of course, on further context provided by discovery.'" *Kuyper v. Bd. of Cty. Comm'rs of Weld Cty., Colo.*, No. 09-cv-00342-PAB-MEH, 2010 WL 1287534, at *9 (D. Colo. Mar. 30, 2010) (quoting *Currier v. Doran*, 242 F.3d 905, 920

_____

[13] All defendants assert that plaintiffs "must allege . . . conduct intended to injure" in order to allege conscious-shocking conduct. *See* Docket No. 61 at 6; Docket No. 62 at 4 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). Defendants are mistaken. While the Supreme Court in *Lewis* states that allegations of "conduct intended to injure in some way unjustifiable by any government interest" are allegations that *"would most probably* support a substantive due process claim" and are "*most likely* to rise to the conscience-shocking level," 523 U.S. at 849 (emphasis added), *Lewis* does not hold that, in order for governmental action to shock the conscience, the government actor must have intended to injure his or her target. The Tenth Circuit has indicated that conscience-shocking conduct "cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct," *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995), and that "the 'shock the conscience' standard requires a high level of outrageousness." *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262 (10th Cir. 1998). In addition, some courts have determined that a plaintiff must "demonstrate that the state action was not only intentional or reckless but also that it possesses a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Kerns v. Ind. Sch. Dist. No. 31 of Ottawa Cty.*, 44 F. Supp. 3d 1110, 1123 (N.D. Okla. 2014) (quoting *Armijo*, 159 F.3d at 1262). Thus, there is no requirement that plaintiffs allege an intent to injure to sufficiently allege conscience-shocking conduct. "Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." *Pena v. Greffet*, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013). To the extent that defendants argue that plaintiffs' claims must fail because they did not allege an intent to injure, the Court rejects the defendants' arguments.

(10th Cir. 2001)); *see also Briggs,* 274 F. App'x at 736 ("Viewed in total, Briggs has described conduct that could be 'construed as conscience-shocking, depending on context' after the facts are fully developed."); *A.A. ex rel. Archuletta v. Martinez*, No. 12-cv-00732-WYD-KMT, 2012 WL 5869158, at *12 (D. Colo. Nov. 19, 2012) (stating that whether or not behavior is conscience shocking "will need to be fleshed out in the evidence, and [such determination is] not appropriate for resolution in connection with [a] motion to dismiss.").

"The Tenth Circuit has found that to state a *prima facie* claim on the conscience shocking part of the test, the behavior must go beyond negligence, and that a plaintiff must 'demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.'" *Weihbrecht v. Cty. of Lincoln, Cornell Corr. of Texas, Inc.*, 2008 WL 11400730, at *3 (D.N.M. Sept. 2, 2008) (quoting *Uhlrig*, 64 F.3d at 574). The Court finds that plaintiffs have met this burden at this stage of the litigation. Plaintiffs have alleged that, generally, defendants fired dozens of gunshots into an occupied vehicle, where the vehicle was motionless and was not moving toward the officers or any other person, where the officers felt no threat or danger to themselves, and where the officers saw no weapon possessed by the vehicle's occupants, which led to one occupant's physical injuries, one occupant's paralysis, and the other occupant's death. *See, e.g.*, Docket No. 54 at 8-9, ¶¶ 44-48; *id.* at 11-12, ¶¶ 62-70. The Court finds that these facts, as alleged, demonstrate a degree of outrageousness and harm that could be construed as conscience-shocking depending on the context, to be revealed through further discovery. Thus, the Court rejects the

defendants' argument that plaintiffs have failed to allege conscious-shocking behavior.

In the alternative, the Littleton defendants argue that plaintiffs cannot establish "any clearly established law which would have placed the individual Defendants on notice that their decisions to use deadly force in this dangerous and unpredictable situation violated the due process clause." Docket No. 61 at 7-8. The brief nature of this argument and the lack of citation to relevant authority limits the Court's ability to provide meaningful analysis on this issue. *Cahill v. Am. Family Mut. Ins. Co.*, 610 F.3d 1235, 1238 (10th Cir. 2010). However, plaintiffs respond to the Littleton defendants' argument, asserting that it is clearly established that, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *See* Docket No. 74 at 12-13 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). In addition, "[t]he Tenth Circuit has repeatedly held that force is unconstitutional when used against individuals . . . 'who were not suspected of serious crimes, posed little to no threat, and put up little to no resistance.'" *Estate of Holmes v. Somers*, 387 F. Supp. 3d 1233, 1252 (D. Kan. 2019) (quoting *McCoy v. Meyers*, 887 F.3d 1034, 1052 n.21) (relying on cases predating the incident at issue in this case)); *see also Morris v. Noe*, 672 F.3d 1185, 1190, 1198 (10th Cir. 2012) (holding that police officers were not entitled to qualified immunity where the officers threw the plaintiff to the ground and fell on top of him despite the fact that the plaintiff had his hands raised, was not attempting to flee, was not a threat to officers, and was suspected at most of misdemeanor assault).

Here, plaintiffs allege that (1) plaintiffs were allegedly being pursued in

connection with a car theft, Docket No. 54 at 2, ¶ 2; at the times of most shooting, the
vehicle was stopped, *see, e.g., id.* at 9, ¶¶ 47-48; *id.* at 10, ¶ 56; (3) plaintiffs were not
using their car as a weapon or displaying any weapons, *id.* at 9, ¶ 48; (4) plaintiffs were
not warned before the officers fired at the car, *see, e.g.*, *id.* at 10-11, ¶¶ 56-59; and (5)
defendants shot dozens of times into plaintiffs' stopped vehicle on three occasions.
*See, e.g.*, *id.* at 8, ¶ 44; *id.* at 9, ¶¶ 46-47; *id.* at 11, ¶ 60.  Plaintiffs allege that
defendants did so despite the fact that defendants were not in imminent danger.  *Id.* at
8, ¶ 44; *id.* at 9, ¶¶ 46-47; *id.* at 10, ¶ 56.  Construing these facts as true, the Court
finds that plaintiffs have plausibly alleged that defendants violated clearly established
law by using deadly force, without being in imminent danger, against plaintiffs, who
posed no threat to the officers and were not resisting.  As a result, the Court rejects
defendants' due process arguments and finds that plaintiffs have stated an excessive
force claim under the Fourteenth Amendment.

### C.  Claim Two – Municipal Liability

Plaintiffs assert a § 1983 claim against the City of Littleton and the City of
Englewood.[14]  Docket No. 54 at 16.[15]  Plaintiffs allege that these defendants
"established policies, procedures, customs, [or] practices" that "proximately caused the

---

[14] While plaintiffs also name defendants Stephens and Collins in this claim,
plaintiffs "concede dismissal of all claims against Defendant John Collins" and "all
claims against Defendant Doug Stephens."  Docket No. 72 at 13 n.3; Docket No. 74 at
15 n.2.  Thus, to the extent that defendants seek dismissal of plaintiffs' second claim as
to defendants Stephens and Collins, *see* Docket No. 61 at 11-12; Docket No. 62 at 7-
10, the motions to dismiss are granted.

[15] Plaintiff Martinez's Monell claim is brought against Littleton and Stephens
only.  Docket No. 54 at 16 n.3.

violations of the Plaintiffs' constitutional and federal rights." *Id.*, ¶¶ 98-99.  In addition, plaintiffs claim that Littleton and Englewood failed to property train their officers.  *Id.* at 17, ¶¶ 100-02.  Defendants argue that this claim should be dismissed for failure to state a claim under Rule 12(b)(6).  Docket No. 61 at 8; Docket No. 62 at 10.

Local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978) (footnote omitted).  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.

In order to state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible "(1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation."  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  The plaintiff must further show that "the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).  "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."  *Barney v.*

*Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998) (citation omitted).  Thus, in order to state a claim under § 1983 for deliberate indifference based on a policy or practice, plaintiff must allege "(1) official policy or custom, (2) causation, and (3) state of mind." *Schneider*, 717 F.3d at 769.  Defendants argue that plaintiffs' *Monell* claim should be dismissed because plaintiff fails to sufficiently allege facts establishing a Littleton or Englewood policy, custom, or practice that was the driving force behind the alleged constitutional violations.  Docket No. 61 at 8; Docket No. 62 at 10.

> An official policy or custom may take one of the following forms:
>
> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation and alteration marks omitted).  Littleton argues that plaintiffs' *Monell* claim must be dismissed under Rule 12(b)(6) because plaintiffs' allegations are "wholly conclusory and . . . merely a formulaic recitation of the elements of the claim" because plaintiffs' allegations do not identify a certain policy that led to the alleged constitutional violations or identify how the city failed to train its officers.  Docket No. 61 at 10, ¶ 21.  Englewood similarly argues that plaintiffs have failed to identify a specific training deficiency.  Docket No. 62 at 13.  Plaintiffs respond that they "have asserted that the

training regarding arrests [has] created department-wide customs and policies of lawlessness which are moving causes behind the excess use of force specifically complained of" and that "[s]uch assertions must be considered as allowed facts and not merely legal conclusions when addressing the . . . motion to dismiss."  Docket No. 72 at 12; *see also* Docket No. 74 at 14 (making identical argument).

To state a *Monell* claim based on the failure to train or supervise, "a plaintiff must sufficiently allege that the failure 'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'"  *Rehberg*, 2012 WL 1326575, at *4 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell.*").

Plaintiffs allege that Littleton and Englewood "failed to properly train and/or supervise [their] officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiffs and the public."  Docket No. 54 at 17, ¶ 100.  They assert that, "[i]n light of the duties and responsibilities of those police officers that participate in arrests . . . the need for specialized training and supervision is so obvious" and that "failure to provide such specialized training and supervision is deliberately indifferent to [plaintiffs' constitutional] rights."  *Id.*, ¶ 101.  Missing from these allegations, however, are any supporting factual allegations providing a basis for

plaintiffs' failure-to-train theory; plaintiffs do not set forth any facts concerning how the individual defendants were trained, who they were trained by, or why their training was deficient.  *See Bark v. Chacon*, No. 10-cv-01570-WYD-MJW, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011) (dismissing municipal liability claim where plaintiff had "generally allege[d]" that the individual defendants were not properly trained but had not "allege[d] specific deficiencies in training and supervision, or explain how the incident described in the Amended Complaint could have been avoided with different or better training and supervision"); *see also Rehberg v. City of Pueblo,* 10-cv-00261-LTB-KLM, 2012 WL 1326575, at *5 (D. Colo. Apr. 17, 2012) (dismissing *Monell* claim where plaintiff had failed to allege specific facts regarding the officers' training, did not identify individuals that allegedly failed to adequately supervise or train).

Moreover, plaintiffs' complaint does not contain any allegations establishing a pattern of similar conduct that would demonstrate a failure to train.  "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."  *Connick*, 563 U.S. at 62 (quotation omitted).  "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.  That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *City of Canton*, 489 U.S. at 390-91.  Here, plaintiffs' allegations focus solely on the events of one night and rely on an assumption that the officers' behavior must have been the result of the Littleton's or Englewood's

training decisions.  These allegations are insufficient to plausibly state a claim of municipal liability.  *Twombly*, 550 U.S. at 570.

Plaintiffs argue that their conclusory allegations "must be considered as allowed facts and not merely legal conclusions when addressing the . . . motion to dismiss," relying on *Asten v. City of Boulder*, 652 F. Supp. 2d 1188, 1193 (D. Colo. 2009). Docket No. 72 at 12; *see also* Docket No. 74 at 14.  *Asten* is distinguishable.  In *Asten*, the plaintiff alleged that the City of Boulder failed to adequately train its officers.  652 F. Supp. 2d at 1209.  The plaintiff identified several specific deficiencies in Boulder's training program, such as its policy of training officers to use Tasers as a first resort, rather than to first attempt to use less harmful methods of restraint or training officers to use their Tasers when physical restraint is not called for.  *Id.*  While the Court acknowledged some deficiencies in the plaintiff's allegations, such as "when and how such policies were adopted," the Court determined that the plaintiff had pled facts, not mere legal conclusions, demonstrating that it was "plausible that a municipal policy or custom was the moving force behind the constitutional deprivation."  *Id.* at 1210-11. Unlike *Asten*, plaintiffs have not identified any specific alleged deficiencies in the officers' training so as to plausibly allege a claim against Littleton or Englewood under a failure-to-train theory.  Plaintiffs' general allegations that the officers' actions can be attributed to a failure to train is insufficient to state a *Monell* claim for failure to train or supervise.  *Bark*, 2011 WL 1884691, at *3.

To the extent that plaintiffs' claims can be read as alleging that an official policy guided the individual defendants' actions, *see* Docket No. 54 at 16, ¶ 99 (alleging that

Littleton and Englewood "developed and maintained policies, procedures, customs and/or practices . . . which were the moving forces behind and proximately caused the violations of the Plaintiffs' constitutional . . . rights"), the Court finds that plaintiffs' allegations are insufficient to state a claim.  While "official policy or custom may be inferred from a complaint's allegations," *Starstead v. City of Superior*, 533 F. Supp. 1365, 1369 (W.D. Wis. 1982) (citing *Powe v. City of Chicago*, 664 F.2d 639 (7th Cir. 1981)), courts have done so where a "systematic pattern" suggests a "policy in some form was the motivating force."  *Id.* at 1369-70.  Here, plaintiffs have not identified a systemic pattern of behavior that would indicate that the individual defendants were following official departmental policies.  Instead, plaintiffs draw an unsupported conclusion that the defendants were acting in accordance with an official policy.  However, "at the pleading stage, the existence of a *Monell* policy is a 'conclusion' to be built up to, rather than a 'fact' to be baldly asserted."  *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1215 (D.N.M. 2015).  Because the Court finds that plaintiffs have failed to state a *Monell* claim against Englewood or Littleton, plaintiffs' *Monell* claim will be dismissed.

### D.  Leave to Amend

In their responses to the motions to dismiss, plaintiffs "respectfully request an opportunity to amend pursuant to Fed. R. Civ. P. 15."  Docket No. 72 at 13 (footnote omitted); *see also* Docket No. 74 at 15.  Defendants do not oppose plaintiffs' request.  *See* Docket Nos. 76 and 77.

Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend

27

should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a). "Rule

15(a)'s purpose is to provide litigants the maximum opportunity for each claim to be

decided on its merits rather than on procedural niceties." *Warnick v. Cooley*, 895 F.3d

746, 754-55 (10th Cir. 2018). While plaintiffs "request an opportunity to amend," the

Court declines to construe this request as a motion to amend the complaint. The

District of Colorado Local Rules provide that "[a] motion shall not be included in a

response or reply to the original motion. A motion shall be filed as a separate

document." D.C.COLO.LCivR 7.1(d). Thus, the dismissed claims will be dismissed

without prejudice so as to permit plaintiffs the opportunity to file a motion to amend

under Rule 15.[16] "Dismissal with prejudice would, effectively, deny the plaintiffs any

further opportunity to amend their complaint" as to the claims dismissed with prejudice.

*United States ex rel. Handlon v. Columbine Mgmt. Servs., Inc.*, 13-cv-00826-REB-KLM,

2016 WL 8673000, at *2 (D. Colo. Mar. 25, 2016); *see also Sanaah v. Howell*, No. 08-

cv-02117-REB-KLM, 2009 WL 4250127, at *1 n.1 (D. Colo. Nov. 23, 2009) ("[B]ecause

it is not clear that amendment would be utterly futile, . . . dismissal . . . should be

without prejudice.").

## IV.  CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' Partial Motion to Dismiss [Docket No. 61], filed by

the Littleton defendants, is **GRANTED IN PART** and **DENIED IN PART** as set forth in

---

[16] Because plaintiff conceded dismissal of the claims against defendants
Stephens and Collins on the merits, those claims will be dismissed with prejudice.

this order. It is further

ORDERED that Defendants City of Englewood, John Collins, and Brian

Martinez's Motion for Partial Dismissal [Docket No. 62] is **GRANTED IN PART** and

**DENIED IN PART** as set forth in this order.  It is further

ORDERED that plaintiffs' first claim is dismissed without prejudice as to the first

and second stops.  It is further

ORDERED that plaintiffs' second claim is dismissed without prejudice as to the

entity defendants and dismissed with prejudice as to defendants Stephens and Collins.

It is further

ORDERED that defendants Stephens and Collins are dismissed as defendants

in this case.  It is further

ORDERED that plaintiffs' third claim is dismissed with prejudice as to the

individual defendants and dismissed without prejudice as to the entity defendants.  It is

further

ORDERED that plaintiffs' fourth claim is dismissed without prejudice.


DATED September 30, 2020.

BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge


29