IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01871-RMR-MEH

MARTA SANCHEZ,
THE ESTATE OF STEPHANIE LOPEZ, and
DOMINIC MARTINEZ,

      Plaintiffs,

v.

ANTHONY GUZMAN, individually,
LUKE MCGRATH, individually,
JOSEPH CARNS, individually, and
BRIAN MARTINEZ, individually,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court are the motions for summary judgment filed by Defendants Anthony Guzman, Luke McGrath, and Joseph Carns (together, "Littleton Defendants") (ECF 144) and Defendant Brian Martinez (ECF 146). The motions are fully briefed and have been referred to this Court for disposition. The Court finds that oral argument would not materially assist in their adjudication. For the following reasons, the Court respectfully recommends granting the motions.

## BACKGROUND

The Littleton Defendants responded to a dispatch that informed them of a reported carjacking with a potentially armed suspect. Marta Sanchez was the driver of the suspected stolen vehicle, a Chevy Malibu, and Stephanie Lopez and Dominic Martinez were passengers in that vehicle. When the Littleton Defendants encountered the Malibu, they pursued the vehicle while

Ms. Sanchez failed to yield. Using a Pursuit Intervention Technique ("PIT maneuver"), the Littleton Defendants were able to briefly stop the Malibu. To evade capture, the Malibu fled the scene, which prompted some of the officers to shoot at the vehicle. The chase resumed, which again was briefly terminated by the use of a PIT maneuver. Undeterred, the Malibu escaped police capture once more, and additional shots were fired by the officers. At the third and final stop of this chase, Ms. Sanchez lost control of the vehicle, which skidded to a stop. Before she could get the car moving again, one of the officers used his vehicle to ram the Malibu. Officer Martinez joined the Littleton Defendants at this stop. Eventually surrounded by officers again, Ms. Sanchez made one final attempt at escape. A last round of gunfire ended that plan.

Through the course of that evening, Ms. Sanchez was shot multiple times, and Ms. Lopez was fatally shot. Mr. Martinez jumped out of the car (unbeknownst to the officers) at some point during the chase. Ms. Sanchez, Mr. Martinez, and the Estate of Ms. Lopez filed suit on June 27, 2019, alleging violations of their Fourth and Fourteenth Amendment rights for excessive force. ECF 1. Following a ruling on motions to dismiss by Chief Judge Philip A. Brimmer, the only remaining claims are those against the Littleton Defendants and Officer Martinez. ECF 78. After a tumultuous discovery period with no less than six discovery conferences, the Littleton Defendants and Officer Martinez have moved for summary judgment on all remaining claims. ECF 144; ECF 146.

## STANDARDS OF REVIEW

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter

of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense— his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id*. at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)). Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment. *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting

*Celotex*, 477 U.S. at 324); *see Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings  and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## STATEMENT OF UNDISPUTED MATERIAL FACTS

On the surface, the parties' briefings would seem to indicate that this case is rife with genuine issues of material fact. However, the evidence removes reasonable disputes as to the *material* facts. In particular, the video evidence of each of the three stops is particularly insightful into what happened on the night in question. When the video evidence contradicts the parties' versions of events, the Court adheres as closely as possible to the video evidence. *See Carabajal v. City of Cheyenne, Wy.*, 847 F.3d 1203, 1207 (10th Cir. 2017) ("[W]e cannot ignore clear, contrary video evidence in the record depicting the events as they occurred."). In doing so, the Court is mindful that all evidence should be viewed in the light most favorable to Plaintiffs. *Id.* With that understanding, the following are the Court's findings of material facts that are relevant to the Court's analysis and either undisputed or supported by the record, when viewed in the light most favorable to Plaintiffs as the non-moving parties.

1.      Just before midnight on the evening of June 29, 2017, the Littleton Defendants were on-duty with the Littleton Police Department when they received a dispatch report that a white Chevy Malibu had been carjacked by four individuals and that one of the suspects was armed and had

fired a shot at or near the victim's head. ECF 144-1, Ex. A at ¶¶ 1–2; ECF 144-2, Ex. B at ¶¶ 1–2; ECF 144-3, Ex. C at ¶¶ 1–2; ECF 144-4, Ex. D at ¶ 10.

2.      The Littleton Defendants, in full police uniform and each driving a fully marked police SUV, began responding to the location of the call, which had been reported at a Dunkin Doughnuts, near the 4700 block of W. Mineral Avenue, in Littleton. Ex. A at ¶ 3; Ex. B at ¶ 3; Ex. C at ¶ 3; Ex. D at ¶ 1.

3.      As the Littleton Defendants proceeded southbound on Santa Fe Drive, they observed the suspect Malibu driving northbound on Santa Fe, near the 6200 block. Ex. A at ¶ 4; Ex. B at ¶ 4; Ex. C at ¶¶ 4–5.

4.      Though unknown to the officers, there were only three suspects in the vehicle at that time. Ms. Sanchez was driving, Ms. Lopez was in the front passenger seat, and Mr. Martinez was in the backseat. ECF 144-5, Ex. E at 190:3–10; ECF 144-6, Ex. F at 114:23–25.

5.      After turning around, the Littleton Defendants began following the Malibu with lights and sirens activated. The suspects did not yield. Ex. A at ¶¶ 5–7; Ex. B at ¶¶ 4–6; Ex. C at ¶¶ 6–7; Ex. E at 205:2–9. Mr. Martinez estimated that the Malibu was driving "at least" seventy-five miles per hour. ECF 172-6, Ex. V at 9:43:10–9:43:25 (conventionally submitted material). Given the totality of these circumstances, the Littleton Defendants were given authorization by their commander to initiate a pursuit. Ex. A at ¶¶ 5–7; Ex. B at ¶¶ 4–6; Ex. C at ¶¶ 6–7; Ex. E at 205:2–9.

6.      Officer Carns, who was leading the pursuit at that time, observed that the suspects ran the red light at Oxford Avenue and narrowly avoided colliding with a motorcycle. Ex. A at ¶ 8; Ex. B at ¶ 6; Ex. C at ¶ 7; Ex. E at 205:10–13. Ms. Sanchez testified that she did not recall almost hitting a motorcycle during the initial pursuit. ECF 158-1, Ex. K at 206:3–7. The suspects then ran the red

light at Dartmouth Avenue and began to weave between lanes. Ex. A at ¶ 8; Ex. B at ¶ 6; Ex. C at ¶ 7; Ex. E at 205:10–13.

7.      Ms. Sanchez admits she ran from police to avoid returning to prison. Ex. E at 201:6–12.

8.      Because the suspects were believed to be armed and given their speeds, erratic maneuvering, and total disregard for multiple traffic control devices, Officer Carns requested and was authorized to perform a PIT maneuver once speeds had decreased. Ex. A at ¶ 8; Ex. B at ¶ 6; Ex. C at ¶ 8.

9.      As they continued north on Santa Fe and approached Arkansas Avenue, the Malibu appeared to skid and decelerate. Officer Carns, intending to stop the vehicle and end the pursuit, performed the PIT maneuver at this time, causing the Malibu to spin roughly 170 degrees and come to rest, facing in a southeast direction on Santa Fe. Ex. A at ¶ 8; Ex. B at ¶ 7; Ex. C at ¶ 8. These events were captured on video. ECF 149, Ex. G-1 (conventionally submitted material); ECF 149, Ex. G-2 (conventionally submitted material).

10.     To prevent the suspects from escaping, Officers Carns and Guzman positioned their vehicles to the southwest and south of the Malibu (respectively), while Officer McGrath positioned his vehicle immediately to the north. The Littleton Defendants exited their vehicles with guns drawn and began shouting commands for the suspects to surrender. Given the time of night, they could not see into the Malibu's passenger compartment. Ex. A at ¶¶ 9–11; Ex. B at ¶ 8; Ex. C at ¶¶ 9–10; Ex. G-1; Ex. G-2; ECF 158-2, Ex. L at 120:1–13; ECF 158-3, Ex. M at 38:12–20, 61:4–7; ECF 158-4, Ex. N at 30:24–31:17.

11.     The Malibu came to a complete stop after the PIT maneuver in the intersection of Santa Fe and East Arkansas. Ex. G-1; Ex. L at 118:3–14; Ex. N at 28:16–20; Ex. M at 35:5–18, 37:18–25.

Ms. Sanchez placed the car in park, Ex. K at 204:10–22, 208:6–21, and all three Plaintiffs put their hands up in the air. Ex. L at 120:8–19, 121:15–17, 122:10–23, 123:1–13; Ex. K at 209:8–210:7.

12.     Officer Guzman was the first person to fire on the vehicle. Ex. A at ¶ 31; Ex. E at 210:14–211:5; ECF 172-4, Ex. N-2 at 35:6–12. Officer Guzman fired in fear for his life. Ex. A at ¶ 13. Officer Guzman did not fire until the vehicle started moving. Ex. G-1; Ex. G-2. At that point, Officer McGrath, who was then facing the Malibu's driver-side door, also opened fire. Ex. C at ¶ 12.

13.     Ms. Sanchez was shot twice (once in the leg and once in the chest) and Ms. Lopez was not hit. Ex. E at 210:23–211:5, 215:1–216:1, 217:17–22. Mr. Martinez alleges he does not know whether he was hit, though he previously told investigators he had not been shot during the entirety of these events. Ex. F at 131:5–22; Ex. V at 9:53:50–9:54:00. Based on the video evidence, Officer Guzman was not in a position to shoot Ms. Sanchez in the leg until after it started driving away from the scene. Ex. G-1; Ex. G-2.

14.     Instead of stopping, the Malibu fled eastbound on Arkansas Avenue. The Littleton Defendants returned to their vehicles and continued the pursuit, with Officer Guzman as the lead vehicle. Ex. A at ¶ 16; Ex. B at ¶¶ 9–10; Ex. C at ¶ 14; Ex. G-1; Ex. G-2.

15.     Plaintiffs turned northbound onto Cherokee Street and proceeded toward Arizona Avenue. They then turned left and began heading north on Cherokee Street, then east on Louisiana Avenue, and eventually north on Bannock Street, before making a U-turn on Bannock and driving back toward Louisiana Avenue. Ex. A at ¶¶ 16–17; Ex. B at ¶ 10; Ex. C at ¶ 14.

16.     Though unknown to officers at the time, Mr. Martinez jumped from the moving vehicle during this portion of the pursuit and had no further involvement with these events. Ex. E at 220:1–7; Ex. F at 130:2–7, 131:10–14.

17.     Officer Guzman executed a PIT maneuver on Bannock Street, between Arizona and Louisiana Avenue. Officers Carns and McGrath attempted to trap the suspects by positioning their vehicles immediately to the north and south of the Malibu, respectively. Ex. A at ¶¶ 17–18; Ex. B at ¶ 10; Ex. C at ¶ 15. These events were captured on video. ECF 149, Ex. H (conventionally submitted material).

18.     Officers Carns and Guzman exited their vehicles. Officer Carns made direct eye contact with the suspect in the passenger seat and began yelling commands for her to show her hands. Ex. A at ¶¶ 18–20; Ex. B at ¶ 11; Ex. C at ¶ 15; Ex. H. Ms. Sanchez did not hear officers give any commands. Ex. K at 228:14–16. Ms. Lopez immediately began to look and reach toward the vehicle's floorboard. Officer Carns concluded she was reaching for a gun and took cover behind Officer Guzman's patrol vehicle. Officer Carns could not see Officer Guzman from this location. Ex. A at ¶¶ 18–20; Ex. B at ¶ 11; Ex. C at ¶ 15; Ex. H. However, Officer Carns never saw a weapon at the second stop or at any time during the pursuit. ECF 158-5, Ex. O at 130:13–19, 145:19–20.

19.     The Malibu began to quickly reverse toward Officer Guzman and ultimately bounced over the curb. Ex. H. In fear of his life, Officer Guzman fired two rounds through the rear windshield, toward the driver's seat. Ex. A at ¶¶ 19–20; Ex. C at ¶ 15.

20.     Because Officer Carns had just observed the vehicle bounce, he believed the suspects had run over Officer Guzman. Ex. B at ¶ 11. Officer Carns fired five rounds through the rear windshield as fast as he could. *Id.* at ¶¶ 12–13. One of those rounds struck Ms. Lopez in the head. *Id.* at ¶¶ 12, 16; Ex. E at 221:22–222:4, 228:4–13. The vehicle then proceeded southbound on Bannock Street, toward Louisiana Avenue, hitting a parked car in the process. Ex. H. The officers resumed the pursuit. Ex. A at ¶ 20; Ex. B at ¶ 13.

21.     As Ms. Sanchez drove south on Bannock St., the Malibu lost traction and spun approximately 45 degrees to the right. ECF 149, Ex. I-1 (conventionally submitted material). The Malibu came to a complete stop on the right side of Bannock St. *Id.* Within moments of stopping, the Malibu's break lights disengaged, and the vehicle began to drive forward. *Id.* Roughly two seconds later, Officer Guzman rammed the Malibu in an attempt to disable it and end the pursuit. *Id.*; Ex. A at ¶¶ 22–23; Ex. C at ¶ 16.

22.     Officers Guzman and McGrath exited their vehicles and began issuing commands for the suspects to surrender. As this was occurring, Officer Martinez of the Englewood Police Department arrived and took up a position south of the Malibu near Louisiana Avenue. Ex. A at ¶¶ 23–24; Ex. C at ¶¶ 16–17; Ex. I-1; ECF 149, Ex. I-2 (conventionally submitted material).

23.     Officer Martinez exited his vehicle after he saw the collision between the Malibu and Officer Guzman's vehicle, and he ran to take cover near the building at the northeast corner of the intersection. ECF 146-1, Martinez Ex. A at 47:17–22, 48:9–14; ECF 148, Martinez Ex. C (conventionally submitted material).

24.     While Officer Martinez was taking cover, the Malibu was idling in the middle of Bannock Street. Martinez Ex. A at 49:10–15; Martinez Ex. C.

25.     From his position beside the building at the northwest corner of the intersection, Officer Martinez could not see inside the building. Martinez Ex. A at 49:16–18, 55:5–10. He did not fire at the Malibu while he was beside the building. *Id.* at 51:10–15.

26.     Officer Martinez remained beside the building for a few seconds and then decided to move from his position to an area behind a van that was on the east side of Bannock Street and out of the line of fire of the Littleton Defendants who had positioned themselves to the north of the Malibu. Martinez Ex. A 50:2–24; Martinez Ex. C; Ex. I-1.

27.     Officer Martinez began to quickly walk along the south edge of the small parking lot in front of the building he had used for cover. Martinez Ex. A at 53:17–20; Martinez Ex. C; Ex. I-1.

28.     He could not see inside the Malibu as he began to move to the east, nor could he tell whether there were any passengers inside the car. Martinez Ex. A at 54:11–13, 54:23–25, 55:5–10, 83:24–84:6.

29.     At that point, and approximately seventeen seconds after being rammed, the Malibu began to move forward and then turn toward the direction of Officer Martinez. Ex. I-2; Ex. A at ¶¶ 24–28; Ex. C at ¶¶ 16–17; Martinez Ex. A 56:19–23, 21:10–20.

30.     In fear of Officer Martinez's life, and for fear of the safety of the public, Officer Guzman fired eleven rounds through the Malibu's rear windshield. Ex. A at ¶ 25; Ex. I-2.

31.     Because the Malibu driving in his direction "freaked [him] out" and caused him to perceive that he was in "a life and death situation," Officer Martinez fired five rounds at the driver's side. Martinez Ex. A at 56:21-3, 57:11–14, 110:20–21, 110:24–11:2, 122:10–13.

32.     The Malibu ultimately did not travel much further, and it stopped at the southern edge of the parking lot. Martinez Ex. A at 73:2–9.

33.     Officer Martinez commanded Ms. Sanchez to put her hands up and when she complied, Officer Martinez called out four or five times to the other officer to stop firing. *Id*. at 79:14–24, 80:5–10.

34.     Officer Guzman did not hear those commands. Ex. A at ¶ 26. Officer Martinez testified that Officer Guzman continued to fire his weapon after the Malibu had stopped. ECF 158-6, Ex. P at 79:25–80:4, 82:13–25, 103:13–24. Officer Guzman declares that he stopped firing his weapon once the Malibu stopped. Ex. A at ¶ 26.

35.     Officers Carns and McGrath did not discharge their firearms at this location. Ex. B at ¶¶ 14–15; Ex. C at ¶¶ 16–17.

36.     In total, the pursuit covered more than six miles and spanned three jurisdictions, including Littleton, Englewood, and Denver. ECF 144-7, Ex. J.

<u>**ANALYSIS**</u>

The doctrine of qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Because qualified immunity is an immunity from suit, rather than a mere defense to liability, it is effectively lost if a case is erroneously permitted to go to trial. *Id.* at 231; *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) ("The privilege is an immunity from suit rather than a mere defense to liability.").

When a defendant asserts qualified immunity, the plaintiff has a two-fold burden to overcome the asserted immunity: (1) "rebut the [defendant's] no-constitutional-rights arguments" and (2) "demonstrate that any constitutional violation was grounded in then-extant clearly established law." *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015) (citing *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009)); *see also Felders v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he 'record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity.'" (quoting *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001))). An official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear"

that every "reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). To satisfy the clearly established prong of the test, the Tenth Circuit requires that "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010).

Traditionally, there has been a deliberate, two-step process for resolving qualified immunity questions: "First, a court must decide whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right. . . . Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (quoting *Saucier v. Katz*, 533 U.S. 194 (2001) (internal citations and quotation marks removed)). However, the Supreme Court has afforded courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009). Here, the Court begins by examining whether the law was clearly established. In doing so, the court will review the actions of the officers at each of the three stops during the car chase.

## I.     First Stop

The Littleton Defendants received a dispatch report that a white Chevy Malibu had been carjacked by four individuals, with one suspect armed and who had already fired a shot at or near the victim's head. Ex. A at ¶¶ 1–2; Ex. B at ¶¶ 1–2; Ex. C at ¶¶ 1–2; Ex. D at ¶ 10. As the Littleton Defendants proceeded southbound on Santa Fe Drive, they observed the suspect Malibu driving northbound on Santa Fe, near the 6200 block. Ex. A at ¶ 4; Ex. B at ¶ 4; Ex. C at ¶¶ 4–5. After turning around, the Littleton Defendants began following the Malibu with lights and sirens

activated. The suspects did not yield. Ex. A at ¶¶ 5–7; Ex. B at ¶¶ 4–6; Ex. C at ¶¶ 6–7; Ex. E at 205:2–9. A reasonable jury could conclude that the Malibu was travelling in excess of seventy-five miles per hour. Ex. O at 80:13–81:9; Ex. V at 9:43:10–9:43:25. As they continued north on Santa Fe and approached Arkansas Avenue, the Malibu appeared to skid and decelerate. Officer Carns, intending to stop the vehicle and end the pursuit, performed a PIT maneuver at this time, causing the Malibu to spin roughly 170 degrees and come to rest, facing in a southeast direction on Santa Fe. Ex. A at ¶ 8; Ex. B at ¶ 7; Ex. C at ¶ 8.

Officers Carns and Guzman positioned their vehicles to the southwest and south of the Malibu (respectively), while Officer McGrath positioned his vehicle immediately to the north. Given the time of night, they could not see into the Malibu's passenger compartment. Defendants exited their vehicles with guns drawn and began shouting commands for the suspects to surrender. Ex. A at ¶¶ 9–11; Ex. B at ¶ 8; Ex. C at ¶¶ 9–10; Ex. G-1; Ex. G-2; Ex. L at 120:1–13; Ex. M at 38:12–20, 61:4–7; Ex. N at 30:24–31:17. Plaintiffs do not deny that the officers shouted commands. ECF 158 at 4, ¶¶ 10–11; Ex. M at 60:21–24. The Malibu came to a complete stop after the PIT maneuver in the intersection of Santa Fe and East Arkansas. Ex. G-1; Ex. L at 118:3–14; Ex. N at 28:16–20; Ex. M at 35:5–18, 37:18–25. Viewing all facts in the light most favorable to Plaintiffs, Ms. Sanchez placed the car in park, Ex. K at 204:10–22, 208:6–21, and all three Plaintiffs put their hands up in the air. Ex. L at 120:8–19, 121:15–17, 122:10–23, 123:1–13; Ex. K at 209:8–210:7. Again, though, it is undisputed that no officer could see inside the car. ECF 158 at 4, ¶ 11.

Plaintiffs claim that while they had their hands up, the officers indiscriminately fired into the vehicle. Ex. L at 120:8–23. That firing, which resulted in Ms. Sanchez's leg being hit by a bullet, is what prompted Plaintiffs to speed off in the car. *Id.* at 123:14–21; Ex. K at 210:20–

212:24, 218:1–5. However, those contentions are not supported by the evidence in the record, including the video of the incident. *Carabajal*, 847 F.3d at 1207. It is uncontroverted that Officer Guzman was the first person to fire on the vehicle. Ex. A at ¶ 31; Ex. E at 210:14–211:5; Ex. N-2 at 35:6–12. Based on the video evidence, Officer Guzman was not in a position to shoot Ms. Sanchez in the leg until after it started driving away from the scene. Ex. G-1; Ex. G-2. Moreover, Officer Guzman was only standing with his gun pointed for about a second before the Malibu started driving away, and it is undisputed that Officer Guzman shouted a command for the occupants to place their hands in the air and to stop. Ex. M at 60:21–24; Ex. G-1; Ex. G-2. Thus, the record before the Court demonstrates that, in fear for his life, Ex. A at ¶ 13, Officer Guzman did not fire until the vehicle started moving. At that point, Officer McGrath, who was then facing the Malibu's driver-side door, also opened fire. Ex. C at ¶ 12. In addition to her leg, Ms. Sanchez was also shot in her chest. Ex. E at 210:23–211:5, 215:1–216:1, 217:17–22.

## II.    Second Stop

The Malibu fled eastbound on Arkansas Avenue, and the Littleton Defendants returned to their vehicles and continued the pursuit. Ex. A at ¶ 16; Ex. B at ¶¶ 9–10; Ex. C at ¶ 14; Ex. G-1. Plaintiffs turned northbound onto Cherokee Street and proceeded toward Arizona Avenue. They then turned left and began heading north on Cherokee Street, then east on Louisiana Avenue, and eventually north on Bannock Street, before making a U-turn on Bannock and driving back toward Louisiana Avenue. Ex. A at ¶¶ 16–17; Ex. B at ¶ 10; Ex. C at ¶ 14. Mr. Martinez jumped from the moving car, although this was unknown to officers at the time. Ex. E at 220:1–7; Ex. F at 130:2–7, 131:10–14. Officer Guzman executed a PIT maneuver on Bannock Street, between Arizona and Louisiana Avenue. Officers Carns and McGrath attempted to trap the suspects by positioning their

vehicles immediately to the north and south of the Malibu, respectively. Ex. A at ¶¶ 17–18; Ex. B at ¶ 10; Ex. C at ¶ 15.

Officers Carns and Guzman exited their vehicles. Officer Carns made direct eye contact with the suspect in the passenger seat and began yelling commands for her to show her hands. Ex. A at ¶¶ 18–20; Ex. B at ¶ 11; Ex. C at ¶ 15; Ex. H. Ms. Sanchez did not hear officers give any commands. Ex. K at 228:14–16. Ms. Lopez immediately began to look and reach toward the vehicle's floorboard. Officer Carns concluded she was reaching for a gun and took cover behind Officer Guzman's patrol vehicle. Officer Carns could not see Officer Guzman from this location. Ex. A at ¶¶ 18–20; Ex. B at ¶ 11; Ex. C at ¶ 15; Ex. H. However, Officer Carns never saw a weapon at the second stop or at any time during the pursuit. Ex. O at 130:13–19, 145:19–20.

Plaintiffs again assert that the officers fired on the vehicle while it was stationary and pinned by the officers' vehicles. Ex. K at 223:21–226:2. However, the video of the incident does not support that assertion. Ex. H. At the time the Malibu came to rest, it was pinned against a building and was parallel to Bannock Street, at approximately 12:04:15. Ex. H. Three seconds later, at 12:04:18, several muzzle flashes are seen from Officer Guzman's gun, as he fired through the Malibu's rear windshield. Officer Guzman then quickly gets out of the way at approximately 12:04:20, and the Malibu enters the frame less than two seconds later, as it continues to reverse perpendicular to the street—right where Officer Guzman had been standing. *Id.* A reasonable jury could find only that for the Malibu to have been pinned horizontally against a house and in a matter of six seconds to be backing into the street that the car would have been moving at the time Officer Guzman fired his gun. Ms. Sanchez even testified that she did not know if she was completely stopped and that she "wasn't driving fast." Ex. E at 225:11–226:2.

In fear for his life, Officer Guzman fired two rounds through the rear windshield, toward the driver's seat; Officer McGrath did not discharge his firearm. Ex. A at ¶¶ 19–20; Ex. C at ¶ 15; Ex. H. When the Malibu reversed, it bounced over the curb. Ex. H. Because he could not see Officer Guzman, Officer Carns believed that the vehicle had run over Officer Guzman. Ex. B at ¶ 11–13. Officer Carns then fired his weapon through the rear windshield. Ex. B at ¶¶ 11–13. One of the shots struck Ms. Lopez in the head. Ex. B at ¶¶ 12, 16; Ex. E at 221:22–222:4, 228:4–13. Officer Carns claims to have fired the weapon due to "the reverse lights coming right at [him] very fast," Ex. B at ¶ 12, yet the video does not show that Officer Carns was ever in the path of the reversing Malibu. Ex. H. The Malibu then proceeded southbound on Bannock Street, toward Louisiana Avenue, hitting a parked car in the process. Ex. A at ¶ 20; Ex. B at ¶ 13; Ex. H.

### III.    Third Stop

While traveling southbound on Bannock Street, the Malibu started to skid and then momentarily came to a stop on Bannock, perpendicular to the lanes of travel. Ex. A at ¶¶ 22–23; Ex. C at ¶ 16; Ex. I-1; Ex. I-2. At approximately 12:04:33, the Malibu begins to skid and then comes to a temporary stop at 12:04:36. Ex. I-1; Ex. I-2. At 12:04:38, the Malibu's break lights disengaged, and the vehicle began to drive forward. Ex. I-1; Ex. I-2. Two seconds later, at 12:04:40, Officer Guzman rammed the vehicle attempting to end the chase. Ex. I-1; Ex. I-2; Ex. A at ¶ 22. The Malibu break lights only reengaged moments before being rammed. Ex. I-1; Ex. I-2. Officers Guzman and McGrath exited their vehicles and began issuing commands for the suspects to surrender. As this was occurring, Officer Martinez arrived and took up a position south of the Malibu, near Louisiana Avenue. Officer Martinez was off to the side of the Malibu, as it remained facing west. Ex. A at ¶¶ 23–24; Ex. C at ¶¶ 16–17; Ex. I-1; Ex. I-2.

After Officer Guzman rammed the Malibu, he positioned himself by the right rear side of his squad car. Ex. I-1. Ms. Sanchez testified that her foot was "stuck," and she attempted to keep her hands in the air. Ex. K at 235:1–4. Officer Martinez ran to take cover near the building at the northeast corner of the intersection. Martinez Ex. A at 47:17–22, 48:9–14; Ex. I-2. From that position, Officer Martinez could not see inside the Malibu. Martinez Ex. A at 49:16–18, 55:5–10. Officer Martinez remained beside the building for a few seconds and then decided to move from this position to an area behind a van that was on the east side of Bannock St. and out of the line of fire of the Littleton Officers. Martinez Ex. A at 50:2–24. He then quickly walked along the south edge of the small parking lot in front of the building he had used for cover. *Id.* at 53:17–20. At that point, and approximately seventeen seconds after being rammed, the Malibu began to move forward and then turn toward the direction of Officer Martinez. Ex. I-2; Ex. A at ¶¶ 24–28; Ex. C at ¶¶ 16–17. Plaintiffs characterize this movement as rolling at an "idle-ish" speed, citing Officer McGrath's deposition, Ex. N at 71:18–72:16, but it is undisputed that the car moved forward.

In fear of Officer Martinez's life, and for fear of the safety of the public, Officer Guzman fired eleven rounds through the Malibu's rear windshield. Ex. A at ¶ 25; Ex. I-2. Because the Malibu driving in his direction "freaked [him] out" and caused him to perceive that he was in "a life and death situation," Officer Martinez fired five rounds at the driver's side. Martinez Ex. A at 56:21-3, 57:11–14, 110:20–21, 110:24–11:2, 122:10–13. The Malibu ultimately did not travel much further, and it stopped at the southern edge of the parking lot. Martinez Ex. A at 73:2–9. Officer Martinez commanded Ms. Sanchez to put her hands up and when she complied, Officer Martinez called out four or five times to the other officer to stop firing. *Id.* at 79:14–24, 80:5–10. Officer Guzman did not hear those commands. Ex. A at ¶ 26. Officer Martinez testified that Officer Guzman continued to fire his weapon after the Malibu had stopped, Ex. P at 79:25–80:4, 82:13–

25, 103:13–24, but Officer Guzman maintains that he stopped firing his weapon once the Malibu stopped, Ex. A at ¶ 26.

### IV.    Clearly Established Law

The Tenth Circuit has unambiguously emphasized that it is a plaintiff's obligation to cite to cases that satisfy the burden of demonstrating the asserted law is clearly established. *Thomas v. Durastanti*, 607 F.3d 655, 669 (10th Cir. 2010) ("The plaintiff bears the burden of citing to us what he thinks constitutes clearly established law."); *see also Gutierrez v. Cobos*, 841 F.3d 895, 903 (10th Cir. 2016) ("Plaintiffs failed to carry their burden of showing that [the defendants] violated clearly established federal law because their counsel did not make any legal argument in the district court to rebut qualified immunity."); *Rojas v. Anderson*, 727 F.3d 1000, 1004 (10th Cir. 2013) (finding that, although the plaintiff "might well have been able to satisfy us that Defendants' actions violated his clearly established rights," the plaintiff "through his counsel, [has simply] failed to carry the burden assigned to him by law."); *Smith v. McCord*, 707 F.3d 1161, 1162 (10th Cir. 2013) ("[The plaintiff], through his counsel, failed to carry the burden assigned him by law."). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Aldaba v. Pickens*, 844 F.3d 870, 877 (10th Cir. 2016). For the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must support the position. *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019), *cert. denied sub nom.*, *I.B. v. Woodard*, — U.S. —, 139 S. Ct. 2616 (2019); *Quinn*, 780 F.3d at 1005.

"The question is not whether there is a prior case with precisely the same facts, but 'whether the law put officials on fair notice that the described conduct was unconstitutional.'" *Mayfield v. Bethards*, 826 F.3d 1252, 1258 (10th Cir. 2016) (citation omitted). The Tenth Circuit has

"cautioned that defining a right too narrowly risks making recovery against a public official virtually impossible because only 'those rare cases in which a precedential case existed which was 'on all fours' factually with the case at bar' would abrogate qualified immunity." *Id.* (citation omitted). On the other hand, the Supreme Court has "repeatedly told courts not to define clearly established law at a high level of generality since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Est. of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). "[S]pecificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an [official] to determine how the relevant legal doctrine . . . will apply to the factual situation the [official] confronts." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Absent a showing of an analogous circumstance, the Supreme Court has stated that only in a "rare obvious case" will an officer's unlawful actions be sufficiently clear to overcome qualified immunity. *City of Escondido, v. Emmons*, — U.S. —, 139 S. Ct. 500, 504 (2019). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To meet their burden of pointing to clearly established law, Plaintiffs argue that the Court need not looker further than *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985). In doing so, they draw the Court's attention to the "sliding scale" of the Tenth Circuit. ECF 158 at 23; ECF 157 at 17. In this context, "'[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)). "Thus, when

an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law." *Id*. But the Supreme Court has limited the application of such an approach: "The general rules set forth in *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (cleaned up). If Plaintiffs are relying on *Graham* and *Garner*, then the question becomes whether this case is the "obvious" case.

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Pauly v. White*, 874 F.3d 1197, 1214–15 (10th Cir. 2017) (quoting *Graham*, 490 U.S. at 395). This reasonableness standard is an objective one, "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "In determining the reasonableness of the manner in which a seizure is effected, '[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). "This balancing test 'requires careful attention to the facts and circumstances of each particular case, including *the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight*.'" *Pauly*, 874 F.3d at 1215 (quoting *Graham*, 490 U.S. at 396) (emphasis in original).

A review of *Casey*, the case cited by Plaintiffs for their reliance on *Graham* and *Garner*, quickly reveals why Plaintiffs' case is not the obvious case. In that case, Mr. Casey went to court to challenge a traffic ticket. 509 F.3d at 1279. He was given his case file to take to the cashier's

window to pay for the ticket. *Id.* His wallet was in his truck, though, so he left the building holding his file. *Id.* at 1279–80. Under Colorado law, that amounted to a possible misdemeanor. *Id.* at 1280. An officer learned of this from the court clerk and then left the courthouse to follow Mr. Casey. *Id.* When the officer found Mr. Casey returning from his truck, he ordered Mr. Casey to return to the truck and hand over the file. *Id.* When Mr. Casey did not, the officer put Mr. Casey's arm in an arm-lock and jumped on his back. *Id.* As the two struggled, another officer arrived on scene and almost immediately fired her Taser at Mr. Casey. *Id.* Shortly thereafter, additional officers arrived on the scene and brought Mr. Casey to the ground where they repeatedly banged his face into the concrete. *Id.* A different officer also Tasered Mr. Casey while he was on the ground. *Id.* The Tenth Circuit found these facts to constitute the obvious case in which *Graham* suffices for clearly established law since "*Graham* establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." *Id.* at 1285.

Here, the crime at issue was far more severe than simply leaving a courthouse building with a file. It is undisputed that Plaintiffs were suspected of the felony of auto theft. Colo. Rev. Stat. § 18-4-409; *see also Shortridge v. Brownlow*, No. 17-cv-02770-MSK-STV, 2020 WL 2322610, at *7 (D. Colo. May 8, 2020) (finding the first *Graham* factor weighed in favor of the officers because the crime at issue was felony auto theft). Additionally, unlike Mr. Casey, Plaintiffs actively fled from the police on multiple instances. They did not yield when the officers first started following the Malibu; Plaintiffs sped off from the scene of the first stop after the use of a PIT maneuver; Ms. Sanchez quickly reversed and angled the car to escape from the second stop despite having police vehicles on all sides of the Malibu; and the video shows the car moving and making a turn as if to attempt escape again at the third stop even after the Malibu was rammed. Finally, while Mr. Casey did not pose an immediate threat to the safety of officers or others, Plaintiffs

certainly did. Ms. Sanchez drove the Malibu at high rates of speed in order to evade capture. When capture was imminent at each of the stops, she often drove the car in or near the direction of the officers. The Tenth Circuit has said that even a slow-moving car can endanger officer safety. *Thomas*, 607 F.3d at 670–71; *see also Carabajal*, 847 F.3d at 1209–10. Moreover, all of this occurred also in the context of the officers reporting to a carjacking with one suspect purportedly armed. Considering the totality of the circumstances and all three *Graham* factors, the justification that allowed the Tenth Circuit to find *Casey* to be an obvious case—namely, that Mr. Casey was a nonviolent misdemeanant who did not flee—is wholly inapplicable in this case.

Although this case in general does not pose an obvious violation of *Graham*, there are two moments that warrant special consideration. First, Officer Carns fired at the Malibu during the second stop even though he was not directly in its path. Although he may not have been in direct danger, it is undisputed that he believed the Malibu had just run over Officer Guzman when it rolled over the curb. It would thus not be objectively unreasonable for Officer Carns to attempt to save his fellow officer's life. *See Carr v. Tatangelo*, 338 F.3d 1259, 1269 (11th Cir. 2003) (finding an officer "acted in an objectively reasonable manner to the apparent imminent threat to his fellow officer to save his life"). Second, viewing the facts in the light most favorable to Plaintiffs, Officer Guzman shot the Malibu at the third stop after it had stopped moving and the passengers had put their hands up at the command of Officer Martinez. But Officer Guzman did not hear Officer Martinez's commands, and there is no evidence that Officer Guzman saw the Malibu's passengers surrender. Given the two prior stops (and the vehicle's movements just moments before), it was also reasonable for Officer Guzman to expect another attempt at flight. *See Kisela*, 138 S. Ct. at 1152 ("And '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'") (quoting *Graham*, 490 U.S. at 396–87)). At best, Officer Guzman's conduct falls in the "hazy border between excessive and acceptable force." *Mullenix*, 577 U.S. at 18 (cleaned up). Qualified immunity protects such conduct. *Id.*

If *Graham* is not enough for clearly established law, Plaintiffs point to two other cases: *Valdez v. Macdonald*, No. 15-cv-00109-RPM, 2019 WL 1651857 (D. Colo. Apr. 17, 2019) and *Estate of Ceballos v. Husk*, 919 F.3d 1204 (10th Cir. 2019). A quick glance at the years in which these cases were decided suggests that these cases did not define clearly established law at the time of the incidents in this case in 2017. *Kisela*, 138 S. Ct. at 1154 (rejecting reliance on a case "because a reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious"). Plaintiffs acknowledge as much, arguing that "[w]hile these decisions occurred after [this case's] use of force, the reasoning from these cases identify established law that predates June 29, 2017, that would have placed all these Defendant officers on notice that their conduct was a violation of clearly established constitutional rights." ECF 158 at 24; ECF 157 at 19. More specifically, Plaintiffs focus on both *Valdez* and *Husk*'s reliance on *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997).

In *Allen*, Mr. Allen left his home with guns and ammunition to go to his sister's house after an altercation with his wife and children. *Id.* at 839. The altercation was reported to the authorities, and the police department held a squad meeting at which this information was disseminated. *Id.* Sometime later, a 911 call was made from the sister's house indicating that Mr. Allen was threatening suicide. *Id.* An officer went to the house where he saw Mr. Allen sitting in the driver's seat of a vehicle with a gun in his right hand. *Id.* The officer repeatedly told Mr. Allen to drop the gun. *Id.* Two other officers arrived on scene, after which the original officer reached into the

vehicle to seize the gun while a second officer held Mr. Allen's left arm. *Id.* The third officer attempted to open the passenger side door. *Id.* In response, Mr. Allen pointed the gun toward the officer at the passenger door, who ducked and moved behind the vehicle. *Id.* Mr. Allen then swung the gun toward the other officers, at which point gunfire was exchanged, resulting in Mr. Allen's death. *Id.* The entire encounter lasted approximately ninety seconds. *Id.* The Tenth Circuit found that there were genuine issues of material fact which prevented the entry of summary judgment in favor of the officers. *Id.* at 840.

As an initial matter, it is important to note that there is no indication that the decision in *Allen* was in the context of a qualified immunity defense. *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001). "[T]he defendants' summary judgment motion was, therefore, judged under the typical summary judgment standard, which requires a lesser showing by the plaintiff." *Id.* Assuming that it does provide some precedential value in the qualified immunity analysis, the facts of *Allen* are too materially different to create clearly established law. At a base level, *Allen* does not concern chasing a vehicle at high speeds. In fact, Mr. Allen never even attempted to flee from the police. The entire encounter occurred in one location within a short-time span; in contrast, the Plaintiffs in this case caused the officers to confront rapidly evolving scenarios in multiple places, all while being in control of a vehicle which could cause harm to the officers or others. Because of these material differences, a reasonable officer would not understand *Allen* to govern his or her conduct in this case.

For clearly established law, the Court is not looking for precedent with the exact facts at issue in this case. *Mullenix*, 577 U.S. at 12 ("We do not require a case directly on point . . . ."). But make no mistake, the inquiry into clearly established law in the Fourth Amendment context is an extremely fact-intensive one. *City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 12 (2021) ("But the

facts of *Allen* are dramatically different from the facts here."); *Kisela*, 138 S. Ct. at 1153–54 (comparing the facts of cases relied on by the Ninth Circuit and finding material differences); *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (describing the relevant inquiry as "whether to shoot a disturbed felon, set on avoiding capture through vehicular flight, when persons in the immediate area are at risk from that flight"); *Carabajal*, 847 F.3d at 1211 ("Such cases , however, are too factually distinct to speak clearly to the situation [the officer] confronted."). For that reason, and as explained below, Plaintiffs' failure to cite binding authority from a car chase case is fatal to their opposition of qualified immunity. True, *Valdez* is such a case, but it is a decision reached after the conduct at issue in this case, and it is a single, unpublished district court opinion that cannot demonstrate clearly established law. *Cummings v. Dean*, 913 F.3d 1227, 1244 (10th Cir. 2019) (noting that "even assuming that [a single, unpublished district court opinion] is entitled to any consideration at all in the clearly-established-law analysis, that consideration would be minimal"). Moreover, that case fails to cite *Mullenix*, an important precedent discussed below, which calls into question its usefulness as persuasive authority.

In sum, none of the cases cited by Plaintiff demonstrate the existence of clearly established law that squarely governs the specific facts and particularized conduct at issue in this case. On that basis alone, Plaintiffs have failed to meet their burden, and Defendants are entitled to qualified immunity. However, the Court would be remiss if it did not address caselaw conspicuously absent from Plaintiffs' briefing. In particular, the Supreme Court's ruling in *Mullenix v. Luna* best demonstrates why the law was not clearly established in this case. In *Mullenix*, a driver of a car fled after being stopped by an officer. 577 U.S. at 8. That officer, later joined by another, chased the driver for roughly eighteen minutes at speeds between 85 and 110 miles per hour. *Id.* While being chased, the driver called dispatch to threaten the officers with a gun he claimed he had. *Id.*

As the chase ensued, other officers set up tire spikes at various locations. *Id.* Trooper Mullenix responded to the situation, intending to set up a spike strip near an overpass. *Id.* at 9. But when he learned of the other spike strip positions, Trooper Mullenix pondered whether shooting at the vehicle would better disable it. *Id.* He asked the dispatcher to inform his supervisor if this would be permissible, but before he received a response, he took a shooting position on the overpass. *Id.* Roughly three minutes later, Trooper Mullenix saw the vehicle approach, and he fired six shots. *Id.* Four of those shots hit and killed the driver. *Id.*

In litigation, the district court denied, Trooper Mullenix's motion for summary judgment on the basis that there were genuine issues of fact as to whether he acted reasonably. *Id.* at 10. The Fifth Circuit affirmed, noting that clearly established rule violated was that an officer may not use "deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Id.* at 12 (cleaned up). The Supreme Court reversed because it "has previously considered—and rejected—almost that exact formulation of the qualified immunity question in the Fourth Amendment context." *Id.* Instead, "[t]he relevant inquiry is whether existing precedent placed the conclusion that Mullenix acted unreasonably" when he "confronted a reportedly intoxicated fugitive, set on avoiding capture through high-speed vehicular flight, who twice during his flight had threatened to shoot police officers, and who was moments away from encountering an officer at Cemetery Road." *Id.* at 13–14. The Supreme Court answered in the negative, conclusively stating that it "has thus far never found the use of deadly force in connection with a dangerous car chase to violate the Fourth Amendment, let alone to be a basis for denying qualified immunity." *Id.* at 15 (citing *Scott v. Harris*, 550 U.S. 372 (2007) and *Plumhoff v. Rickard*, 572 U.S. 765 (2014)).

The analysis in *Mullenix* leaves little doubt that the appropriate inquiry to determine clearly established law hinges on the facts and conduct at issue. The Supreme Court specifically seems to distinguish dangerous car chase cases from other Fourth Amendment contexts. Moreover, the pronouncement that in those types of cases the Supreme Court has yet to find a violation of the Fourth Amendment weighs heavily against the notion that the law would be clearly established that Defendants in this case violated Plaintiffs' Fourth Amendment rights.[1]

## CONCLUSION

During the late hours of July 29, 2017, a tragic (and avoidable) series of events led to the death of Ms. Lopez and the injuries sustained by Ms. Sanchez and Mr. Martinez. By choosing to flee, Plaintiffs endangered the lives of themselves, the responding officers, and the public. To mitigate that danger, the Littleton Defendants and Officer Martinez decided to use deadly force. The question is whether that use of force constituted a violation of Plaintiffs' clearly established rights. Without commenting on whether such actions were in-fact constitutional violations, Plaintiffs have failed to meet their burden to point to clearly established law. On that basis alone, all Defendants should be entitled to qualified immunity. Accordingly, the Court respectfully recommends **granting** both the Littleton Defendants and Officer Martinez's motions for summary judgment [filed February 4, 2022; ECF 144 and 146] and entering summary judgment in their favor on all claims.[2]

---

[1] The Court notes that Plaintiffs only cited to cases concerning violations of the Fourth Amendment. To the extent, any of Plaintiffs' Fourteenth Amendment claims survive in light of *Torres v. Madrid*, 141 S. Ct. 989 (2021), they have failed to meet their burden of pointing to clearly established law for any violation of the Fourteenth Amendment.

[2] Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive, or general objections. A party's failure to file such written objections to

Respectfully submitted this 29th day of July, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

---

proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).